IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

GLORIA LEE MILLER,

      Plaintiff,

v.                             CASE NO. 2:11-cv-00816

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Gloria Lee Miller (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on January 8, 2009, alleging disability as of June 10, 2008, due to fibromyalgia, high blood pressure, osteoarthritis, diverticulitis, hiatal hernia, bursitis, and carpal tunnel.  (Tr. at 13, 180-84, 185-88, 217-25, 262-68, 286-93.)  The claims were denied initially and upon reconsideration.  (Tr. at 13, 91-96, 106-08, 109-11.)  On June 29, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 112.)  The hearing was held on June 23, 2010 before the Honorable Thomas W. Erwin.  (Tr. at 13, 63-86, 121, 127.)  A supplemental hearing was held on March 15, 2011.  (Tr. at 13, 34-61, 153, 159.)  By decision dated April 4, 2011, the ALJ determined that Claimant was not

entitled to benefits.  (Tr. at 13-27.)  The ALJ's decision became the final decision of the Commissioner on September 13, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On October 31, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads

to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 15.)   Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc disease of the lumbar spine, cervical spine facet joint disease, hypertension, osteoarthritis/fibromyalgia, headaches, depression, anxiety, and low intellectual functioning.   (Tr. at 15-17.)   At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 17-19.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 19-25.)  As a result, Claimant cannot return to her past relevant work.  (Tr. at 25.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as ticket taker, counter clerk, and order caller, which exist in significant numbers in the national economy.  (Tr. at 25-26)  On this basis, benefits were denied.  (Tr. at 26.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson,

substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 44 years old at the time of the administrative hearing.  (Tr. at 39.)  She has a ninth grade education.  (Tr. at 40.)  In the past, she worked as a nanny/babysitter, a certified nursing assistant [CNA] at a nursing home and in home care, a deli worker at a convenience store, a hotel housekeeper, and a greenhouse worker.  (Tr. at 40-41, 226, 237.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Health Evidence

On January 17, 2007, Claimant was evaluated at the Charleston Area Medical Center

[CAMC] Medicine and Rehabilitation Center.  (Tr. at 323-27.) The referring diagnosis was "fibromyalgia."  (Tr. at 323.)  The physical therapist, Sarah Doerner, stated that the goal was to reduce Claimant's pain level.  Id.

On February 21, 2007, Ms. Doerner stated that Claimant was being discharged from formal therapy, had a diagnosis of "Fibromyalgia/Bilateral hip bursitis", had attended six physical therapy visits, and that her range of motion was within normal limits.  (Tr. at 317.)

On December 12, 2008, Steven R. Matulis, M.D., performed an upper gastrointestinal endoscopy with esophageal dilation.  He found: "The upper gastrointestinal tract was normal with no obvious abnormalities.  The esophagus was dilated...without difficulty or complications...Hopefully, this will resolve her symptoms.  If she has continued dysphagia, I will see her back in the office."  (Tr. at 329.)

Records indicate Claimant was treated at Family Care on seven occasions between April 29, 2009 and April 6, 2010.  (Tr. at 413-29, 466-74.)  Although the handwritten notes are largely illegible, the words "anxiety/depression...Zoloft 25 mg helpful, 50 mg 'too much'...Fibromyalgia, Lyrica 50 mg" are legible.  (Tr. at 415-16.)

On March 5, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment.  (Tr. at 335-42.)  The evaluator, A. Rafael Gomez, M.D., stated that Claimant's primary diagnosis is fibromyalgia and her secondary diagnosis, hypertension.  (Tr. at 335.)  Dr. Gomez marked that Claimant could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push and/or pull (including operation of hand and/or foot controls).  (Tr. at 336.)  He found that

Claimant could occasionally perform all postural limitations.  (Tr. at 337.)  He stated that she had no manipulative, visual, communicative  or environmental limitations, save to avoid concentrated exposure to vibration and hazards.  (Tr. at 338-39.)  Dr. Gomez concluded: "Patient is not fully credible.  Has several allegations not supported by the medical findings.  Her main diagnosis is fibromyalgia.  Reduced to light work." (Tr. at 340.)

On March 19, 2009, Claimant was evaluated by Todd A. Witsberger, M.D. for "an approximately one-year history of spontaneous occasional clear discharge from the left nipple...occasional left-sided mastalgia...Bilateral mammography from 09/26/08 was essentially unremarkable, and given a BI-RADS category 1...I reviewed the findings with Ms. Miller, and reassured her of the general benign nature of this process." (Tr. at 343-44.)

On April 17, 2009 and April 29, 2009, Dr. Witsberger reviewed a repeat left mammogram and a left breast ultrasound "just to be safe" and concluded: "No mammographic evidence of malignancy in the left breast" and "Unremarkable left breast ultrasound...Normal." (Tr. at 344, 345, 347.)

On May 17, 2009, Claimant presented to the CAMC Emergency Department due to "pain in her left lower abdomen for about 1 week."  (Tr. at 350-54, 499-507.)  Nimish K. Mehta, M.D. diagnosed: "1. Mild diverticulitis; 2.  Pericardial cyst; 3.  Fatty liver." (Tr. at 352.)

Records indicate Claimant was treated at Mountain State Medicine and Rheumatology, PLLC, from January 7, 2009 to May 20, 2009 for joint pain and fibromyalgia.  (Tr. at 355-86.)

On June 11, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment.  (Tr. at 387-94.)  The evaluator, Uma Reddy, M.D. stated

that Claimant's primary diagnosis was "fibromyalgia, OA [osteoarthritis], CTS [carpal tunnel syndrome]", her secondary diagnosis was "Hypertension", and her "other alleged impairments" were "Hiatal hernia, Diverticulitis." (Tr. at 387.)   Dr. Reddy marked that Claimant could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push and/or pull (including operation of hand and/or foot controls). (Tr. at 388.) She found that Claimant could occasionally perform all postural limitations.   (Tr. at 389.)   She stated that Claimant had no manipulative, visual, communicative or environmental limitations, save for "mild limitations" in handling and fingering due to "mild CTS...but can still manage light work" and to avoid concentrated exposure to extreme temperatures, vibration and hazards. (Tr. at 390-91.) Dr. Reddy concluded that Claimant was "partially credible with supporting medical evidence...She is on pain medications and all other appropriate meds, stable.   Physical limitations are expected and aggravated by her obesity but no listing limitations.  Her ADLs indicate light work at home, can drive and shop.  Considering the whole evidence her RFC is reduced as noted here only." (Tr. at 392.)

On September 14, 2009, Claimant was treated at Med Express for rib pain after hitting her "left side of chest with arm rest."  (Tr. at 397.) John Balzano, M.D. stated: "Multiple views of the left ribs were obtained.  There is no evidence of acute or healing fracture.  No bony destruction is noted.  There is no evidence of pleural effusion or pneumothorax." (Tr. at 400.)

On November 10, 2009, Claimant presented to Charleston Area Medical Center

[CAMC] Emergency Department with headache and chest pain complaints. (Tr. at 431-61, 509-38.) Kristen L. Helmick, M.D. discharged Claimant on November 12, 2009 with this diagnosis:

> PRINCIPAL DIAGNOSES:
> 1.    Chest pain, atypical, acute myocardial infarction ruled out.
> 2.    Severe cephalgia [headache], likely secondary to migraine.
> 3.    Diarrhea.
>
> SECONDARY DIAGNOSES:
> 1.    Hypertension.
> 2.    Fibromyalgia.
> 3.    Dyslipidemia.
> 4.    Hiatal hernia.
> 5.    Low back pain.

(Tr. at 431.)

On January 4, 2010, Kiran Kresa-Reahl, M.D., Capitol Neurology, evaluated Claimant and concluded that Claimant's recent headaches, which had improved since her hospitalization, were "likely related to incomplete control of Hypertension (high blood pressure)...but also with some migrainous features." (Tr. at 484.)

On April 20, 2010, Leah Triplett, D. O., Mountain State Medicine and Rheumatology, saw claimant for a follow-up visit regarding fibromyalgia and osteoarthritis. (Tr. at 475-79.) She stated that Claimant had not been seen in one year and assessed that her fibromyalgia had worsened. (Tr. at 475, 478.) Dr. Triplett prescribed Cymbalta and Ambien, and recommended: "Increase daily aerobic exercise - recommend water therapy; Recommend Carpal Tunnel Splint OTC [over the counter]. (Tr. at 478-79.)

On April 29, 2010, Claimant presented to the CAMC Emergency Department with complaints of dizziness and headache. (Tr. at 540-66.) The attending physician, Jeffrey M. Mullen, D.O. concluded: "The patient underwent EKG which showed a heart rate of 69,

normal P axis.  There is some left ventricular hypertrophy noted, compared with previous EKG of 11/12/2009 is unchanged.  CBC was essentially unremarkable.  Tilt test was performed, which was essentially unremarkable." (Tr. at 541, 543.)

On April 30, 2010, Claimant presented to the CAMC Emergency Department with complaints of abdominal pain and rectal bleeding.  (Tr. at 568-84.)  Leon S. Kwei, M.D., the admitting physician, stated: "The patient has had several episodes of rectal bleeding here in the emergency department but no hemodynamic compromise or vomiting...Discussion was made with the patient regarding findings.  She was offered admission to GI service; however, she declined and wanted to go home."  (Tr. at 569.)  Timothy A. Conner, M.D. stated that a CT pelvis with contrast showed: "Mild thickening of the walls of the descending colon with minimal surrounding inflammatory change, the pattern may be indicative of inflammatory or infectious colitis or possibly antibiotic induced colitis."  (Tr. at 571.)

On May 10, 2010, Dr. Kresa-Reahl stated: "Her headaches are under good control as has her blood pressure.  She is struggling with her fibromyalgia.  So far she's failed Cymbalta, Savella, and Lyrica...she can continue using the fiorinal as needed (she hardly needs use it)."  (Tr. at 481-82.)

On May 14, 2010, Steven R. Matulis, M.D., performed a colonoscopy on Claimant and concluded: "There were a few scattered diverticula in the left colon, but no other pathology...I suspect she had an episode of ischemic colitis, which has now resolved." (Tr. at 604-05.)

On June 4, 2010, J. Todd Kuenstner, M.D., Family Care, CAMC, stated that a test showed Claimant to be "insufficient" for vitamin D and recommended she take 1000 mg

daily.  (Tr. at 646-47.)

On June 10, 2010, Dr. Triplett, Mountain State Medicine and Rheumatology, stated that Claimant had a follow up visit regarding her fibromyalgia and osteoarthritis.  (Tr. at 586-93.)  She stated:  "Patient feels the fibromyalgia pain has worsened.  She could not tolerate Cymbalta or Savella due to nausea.  Most of the pain is felt in hands and arms and left hip.  She denies joint swelling."  (Tr. at 586.)

On June 10, 2010, John F. Mega, M.D., radiologist, CAMC, reviewed x-rays of Claimant's right hand and each knee.  Regarding the hand, he concluded: "Three projections of the right hand were obtained.  No significant degenerative changes are present.  There is no radiographic evidence for acute bone or joint abnormality."  (Tr. at 606.)  Regarding the knees, he concluded: "A frontal projection of each knee was obtained with the patient standing.  No significant degenerative change is present.  The medial and lateral joint compartments of each knee are symmetric."  (Tr. at 607, 636, 637, 638.)

On July 15, 2010, Sherrial Simmers, D.O., Family Care, CAMC, increased Claimant's vitamin D to 2000 mg daily.  (Tr. at 649-50.)

On August 11, 2010, Douglas O'Dell, D.D.S., a specialist in temporomandibular joint disorder [TMJ] and orofacial pain, diagnosed Claimant with "[a]nterior displacement of the articular disc without reduction L [left] (chronic closed lock)."  (Tr. at 615.)  She was advised to have "to return for splint therapy treatment...physical therapy...possible mandibular manipulation."  Id.

On August 23, 2010, Dr. Triplett evaluated Claimant and concluded that her fibromyalgia had worsened.  (Tr. at 670.)  She recommended: "Increase daily aerobic exercise - recommend water therapy; Stretching of trochanteric bursa(e) twice daily for one

week; Recommend Carpal Tunnel Splint OTC to be worn nightly." (Tr. at 671.)

On September 9, 2010, October 13, 2010, and December 1, 2010, Claimant was a patient of Darrell Kevin Boggess, D.O., Family Care, CAMC.  Although the handwritten notes are largely illegible, the following is legible: "Doing well on medication; no side effects, no problems...Better today." (Tr. at 651-53.)

On September 14, 2010, Eli Rubenstein, M.D. reviewed an x-ray report of Claimant's lumbar spine for Kip Beard, M.D.  The report stated: "There is normal alignment of the lumbar spine.  There is no compression fracture or appendicular defect.  The lumbar interspaces are regular and the vertebral bodies are normal in height.  The sacro-iliac joints are normal.  There is no scoliotic deformity.  Impression: Normal lumbar spine." (Tr. at 632.)

On September 14, 2010, a State medical source provided an internal medical examination.  (Tr. at 618-32.) The examiner, Kip Beard, M.D. concluded:

> IMPRESSION:
> 1.    Chronic cervical and lumbosacral strain.
> 2.    Lumbar x-ray evidence of scoliosis and spondylosis with degenerative disk disease.
> 3.    Diverticulosis coli with apparent history of diverticulitis.
> 4.    Hypertension.
> 5.    Mild right carpal tunnel syndrome.
> 6.    Osteoarthritis.
>
> SUMMARY: The claimant is a 43-year-old female with chronic back and neck pain and history of fibromyalgia.  Examination today revealed some pain related range-of-motion loss, and negative evaluation of any neurologic compromise today.  In terms of the joints, examination reveals findings of osteoarthritis with Heberden's nodes and joint crepitus at the knees, and no effusions and evidence of inflammatory arthritis.  There was synovitis identified with no synovial thickening.
>
> Regarding the carpal tunnel, provocative testing seems mildly positive on the opposite side today.  There was no intrinsic hand atrophy.  Manipulation is

11

> preserved.  Regarding the hypertension, I appreciated no end organ damage there today.  In terms of the diverticular disease, it seems like she had a mild bout of diverticulitis in the past.  Abdominal exam reveals soft, nontense, nondistended abdomen, mildly, generally tender to palpation.

(Tr. at 623.)

On September 14, 2010, Dr. Beard completed a Medical Source Statement of Ability to do Work-Related Activities (Physical).  (Tr. at 625-30.)  Dr. Beard marked that Claimant can lift/carry continuously up to 10 pounds; frequently 11 to 20 pounds; occasionally 21 to 50 pounds; and never 51 to 100 pounds.  (Tr. at 625.)  He marked that Claimant can sit for one hour without interruption; stand for 30 minutes without interruption; and walk for 30 minutes without interruption.  (Tr. at 626.)  He marked that Claimant can sit a total of 4 hours in an 8 hour work day; stand for 2 hours in an 8 hour work day; and walk for a total of 2 hours in an 8 hour work day.  Id.  He noted that Claimant does not require the use of a cane to ambulate.  Id.  He marked that Claimant can use her right hand to reach and push/pull occasionally and do handling, fingering, and feeling frequently.  (Tr. at 627.)  He marked that Claimant can use her left hand to reach and push/pull occasionally and do handling, fingering, and feeling continuously.  Id.  He marked that she could use her right foot occasionally to operate foot controls but could never use her left foot.  Id.  He marked that she could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, continuously balance, and never climb ladders or scaffolds.  (Tr. at 628.)  He did not evaluate her hearing or vision.  Id.  He marked that she could occasionally tolerate all of the environmental limitations, save for unprotected heights, which she could never do and dust, odors, fumes and pulmonary irritants which she could frequently tolerate.  (Tr. at 629.)  He noted that she could tolerate very loud (jackhammer) noise.  Id.  He marked that

Claimant can perform activities like shopping, can travel without a companion for assistance, can ambulate without assistance, can walk a block at a reasonable pace on rough/uneven surfaces, can use standard public transportation, can climb a few steps at a reasonable pace with the use of a single hand rail, can prepare a simple meal and feed herself, can care for personal hygiene, and can sort, handle, use paper/files.  (Tr. at 630.)

On September 24, 2010, Stephen Elksnis, M.D., radiologist, CAMC, stated that a bilateral digital mammography was negative.  (Tr. at 641-45.)

On October 26, 2010, Dr. Triplett gave Claimant a "Left trochanteric bursa Injection."  (Tr. at 672.)

On December 15, 2010, Claimant presented to Med Express Urgent Care for treatment of a swollen left knee.  (Tr. at 662-66.)  John Balzano, M.D., stated that an x-ray of the left knee, 3 views, showed "no evidence of acute fracture, dislocation, bony destruction, or radiopaque foreign body."  (Tr. at 666.)

On December 22, 2010, Dr. Triplett assessed that Claimant's fibromyalgia, right carpal tunnel syndrome, and insomnia were worsening and recommended: "referral to physical therapy for trochanteric (hip) bursitis…Carpal Tunnel Splint OTC to be worn nightly…icing and ACE wrap to left knee; if no improvement in one week then call and will do MRI scan."  (Tr. at 675-76.)

On January 22, 2011, Claimant had a cervical spine MRI at Thomas Memorial Hospital per the request of Dr. Triplett due to Claimant's neck pain and bilateral upper extremity pain.  (Tr. at 678-79, 704-05.)  Adam T. Krompecher, M.D. stated that C2-3, C3-4, C7-T1 were within normal limits and that C4-5, C5-6, and C6-7 showed "mild to moderate facet joint disease."  (Tr. at 678.)  His impression: "1.  Mild cervical spondylosis

13

secondary to chronic changes, as described above.  2.  No disk herniation or significant spinal stenosis."  (Tr. at 679, 705.)

On February 25, 2011, Richard G. Bowman, M.D. stated that Claimant had been referred to him by Dr. Triplett regarding her neck, left hip and knee pain which Claimant reported to be "constant (100% of the time)." (Tr. at 694, 698.)

On February 28, 2011, a record indicates that Claimant was scheduled to have "injections" by Dr. Bowman at The Center for Pain Relief, Saint Francis Hospital, on March 9, 2011, March 23, 2011, and April 6, 2011 with a follow up appointment scheduled for April 14, 2011.  (Tr. at 690.)

<u>Mental Health Evidence</u>

On September 19, 2009, Sheila Emerson Kelly, M.A., a licensed psychologist, provided a psychological evaluation upon referral by Claimant's representative.  (Tr. at 402.)  Ms. Kelly stated:

> <u>MENTAL STATUS EXAMINATION</u>:
> This is a small, overweight, white female who is neatly groomed and clean. She is very anxious and depressed, and displays some pressure of speech which tends to be, in my opinion, habitual.  She starts sentences, doesn't finish them, jumps to the next topic, and is tearful, wringing her handkerchief.  She is something of an enabler who gets caught up in her family psychopathology and drama.  In return, that generates considerable stress, depression, and stress-related pain.  It's obvious that the pain she experiences with her fibromyalgia and arthritis is directly related to the degree of stress she is experiencing.
>
> She sleeps poorly and is agitated and restless.  She suffers from stress related diarrhea and nausea and has hiatal hernia as well.  Her weight is generally stable.
>
> Her mood is depressed, agitated, and anxious.  She lacks insight into the relationship between her pain and her psychiatric issues.  She is generally passive, dependent, hopeless and helpless, and more than anything, rather self-defeating.  She denies any history of suicidal ideation.

14

On the Mental Status Examination, she obtained a score of 25 out of 30. She was unable to copy a relatively complex design, recalled only one out of four objects after five minutes, and could not spell "world" backward. I suspect that most of these cognitive deficits are related to somewhat limited intellectual ability. She was able to recall only four digits forward and three in reverse.

TEST RESULTS:
Subtest scores on the Wechsler Adult Intelligence Scale-III are as follows...

Her Full Scale IQ [74] falls within the borderline range of intellectual ability. I believe that this score is accurate and it is certainly consistent with her history of employment, inability to pass a GED, poor school performance, and clinical presentation including the limitations she demonstrated on the Mental Status Examination.

On the Wide Range Achievement Test-4...scores are consistent with the IQ scores obtained on the Wechsler Adult Intelligence Scale-III. They reflect academic functioning levels below the seventh grade. She has sufficient academic ability to function from one day to the next but overall would struggle with complex written or oral instructions.

*      *      *

_Concentration, Persistence, and Pace_:
Mrs. Miller is functioning in the borderline range of intellectual functioning. She is depressed and agitated and has difficulty focusing on tasks, completing thoughts, and it's obvious that her recent and remote memory are impaired from the results on the Wechsler Adult Intelligence Scale-III and the Mental Status Examination.

_Deterioration in Work or Work-like Settings_:
Mrs. Miller has been employed most of her adult life although her positions have generally been relatively uncomplicated. She impresses me as being somebody who would be dependable were it not for her multiple medical problems. Many if not all of her aches and pains are exacerbated by her anxiety and depression which is pervasive.

Mrs. Miller is competent to manage her own financial affairs should she be determined to be disabled.

DIAGNOSTIC IMPRESSION:
Axis I            Generalized Anxiety Disorder
                  Depressive Disorder, Not Otherwise Specified
                  Pain Disorder Associated with General Medical Condition and
                  Psychological Factors

15

|          | Rule our Attention Deficit Hyperactivity Disorder |
|----------|---------------------------------------------------|
| Axis II  | Borderline Intellectual Functioning |
| Axis III | Fibromyalgia; Osteoarthritis; Bursitis; Hypertension; GERD; Chronic Pain; Hiatal Hernia |

(Tr. at 405-09.)

On September 19, 2009, Ms. Kelly completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  (Tr. at 411-12.)  She marked that Claimant had a "Good" ability to perform the following work-related mental activities: Remember locations and work-like procedures; Understand and remember short, simple instructions; Carry out short, simple instructions; Sustain an ordinary routine without special supervision; Work with or near others without being distracted by them; Make simple work-related decisions. (Tr. at 411.)  She marked that Claimant had a "Fair" ability to perform these activities: Understand and remember detailed instructions; Perform activities within a schedule, maintain regular attendance and be punctual; Perform at a consistent pace.  Id.  She marked that Claimant had a "Poor" ability to perform these activities: Carry out detailed instructions; Maintain attention and concentration for extended periods; Complete a normal workday or workweek. Id.

On March 15, 2010, Nohl Braun, M.D., Process Strategies, completed a comprehensive psychiatric evaluation of Claimant.  (Tr. at 495-97.)  Dr. Braun concluded:

> MENTAL STATUS EXAMINATION:
> Seen was a forty-three-year-old female dressed in casual clothes, reasonably clean, short length hair, dressed quite properly and conservatively.  She reports on mood its "medium" she's not sad feels drained however, not suicidal, not homicidal at this time.  No paranoia, delusions, hallucinations, or OC [obsessive compulsive] symptoms.  Alert and oriented X3.  Serial 3's 4/S. Sentences are organized and goal directed.  Gave consistent history very talkative.  Judgment and insight intact; questions judgment and insight elsewhere.  Judged to be of average/above average intelligence based on the history and mental status examination.

16

FORMULATION:
This is a forty-three-year-old female who comes in with symptoms consistent with Major Depression, Recurrent, Moderate.  She's agreeable to treatment with Cymbalta and return to the clinic in one month.  Will also additionally get her into therapy for the many issues she has...Bankruptcy filed three months ago.  Has been pillar of family chronically.  Off work June 2008 secondary to stress and physical problems.  Chronic mental illness.  Global Assessment of Functioning Current 60.  Past year Highest Estimate: 70-80.

(Tr. at 496-97.)

Records indicate claimant was treated by John B. Todd, M.D., Process Strategies on March 26, 2010, April 13, 2010, and May 11, 2010.  (Tr. at 487-93.)  Although the handwritten records are largely illegible, a type written note dated April 13, 2010, signed by Dr. Braun, indicates: "Patient presented today, not suicidal, not homicidal.  No acute reactions or side effects to meds...States she was unable to fill prescription due to her insurance requiring step therapy.  Thus patient is in agreement to restart trial of Cymbalta, will have assistant contact insurance."  (Tr. at 494.)

On June 1, 2010, Dr. Braun, Process Strategies, stated that Claimant had a medications check: "Patient presented today, not suicidal, not homicidal.  No acute reactions or side effects to med.  She does get occasionally dizziness secondary to the Buspar and thus we can continue the dose using more at night she can sleep it off to which she agreed and return to the clinic in three months."  (Tr. at 634.)

On June 16, 2010, Dr. Todd, Process Strategies, completed a Medical Source Statement of Ability to do Work-Related Activities.  (Tr. at 595-97.) Dr. Todd marked "Yes" to the inquiry  "Is ability to understand, remember and carry out instructions affected by the impairment?"  (Tr. at 595.)  He marked that Claimant had a "Good" ability to "Make simple work-related decisions."  Id.  He marked that Claimant had a "Fair" ability to

"Remember locations and work-like procedures; Understand and remember short, simple instructions; Carry out short, simple instructions; Maintain attention and concentration for extended periods; Perform activities within a schedule, maintain regular attendance and be punctual; Sustain an ordinary routine without special supervision; Work with or near others without being distracted by them; Complete a normal workday or workweek; Perform at a consistent pace." Id. He marked that she had a "Poor" ability to "Understand and remember detailed instructions" and "Carry out detailed instructions." Id. His findings to support this assessment: "Mental status exam, concentration - fair - slow serial 3's, serial 7's made 2 X [times]; memory - immed [immediate] mem [memory] WNL [within normal limits] - recent - mod [moderately] def [deficient] remembered 2/4 after 5 - remote memory intact." (Tr. at 596.) Dr. Todd marked "No" to the inquiry "Is ability to respond appropriately to supervision, co-workers, and work pressures in a work setting affected by the impairment." Id. He marked "Yes" to the question "Are there any other capabilities affected by the impairment?" He identified the capability as "work - daily activities" and the effect as "slow or avoided." (Tr. at 597.) He stated that the findings to support this assessment were "pain reaction per self report." Id. He marked that Claimant was able to manage benefits in her own interest. Id.

On January 29, 2011, Sheila Emerson Kelly, M.A., licensed psychologist, provided an "update" evaluation of Claimant upon referral by her representative. (Tr. at 680-85.) Ms. Kelly stated: "As was identified in my last evaluation, she remains self-defeating and very obsessive about every real or imagined medical concern." (Tr. at 681.) She concluded:

MENTAL STATUS EXAMINATION:
This is an average height, slightly overweight, white female who is neat, clean, and nicely dressed. She is tearful, depressed, and extraordinarily negative.

18

She believes that nothing will improve her life, nothing will ever change, and she dwells on her misery, obsessively developing more reasons to be miserable.  Her behavior tends to be extraordinarily self-defeating.

She claims to sleep poorly but I suspect she dozes off and on during the day.  Appetite is described as poor but she has gained ten pounds in the past year.  She looks rather puffy, pale, and not healthy.  She gets no exercise and rarely leaves her house.  Her mood is depressed and despondent.  She denies suicidal ideation...On the Mental Status Examination, she obtained a score of 30 out of 30.  There is no reason to suspect any cognitive deficits as identified by this instrument...

On the Beck Depression Inventory-II, Mrs. Miller obtained a score of 31.  This score reflects moderate to severe levels of depression...

Mrs. Miller spends most of the day lying on the couch.  She has no hobbies or recreational interests...She leaves her house about once a week to go to the grocery store with her husband but otherwise does not go anywhere...

Mrs. Miller has no friends or social outlets other than her daughter who lives some distance away and is therefore unavailable except by telephone...

Mrs. Miller's cognitive functioning was within normal limits as measured by the Mental Status Examination...

Mrs. Miller has not been employed since 2008.  Even then, her only employment had been providing in-home care for her mother five hours a day.  Essentially she has never worked much in the public sphere.  She is extraordinarily avoidant and rather dependant as well.  Her personality pathology in combination with her depression and anxiety cause her to experience pain at a much more magnified level than would perhaps be warranted given the actual clinical abnormalities evident...

DIAGNOSTIC IMPRESSION:
| | |
|---|---|
| Axis I | Dysthymic Disorder |
| | Anxiety Disorder, Not Otherwise Specified |
| | Pain Disorder Associated with General Medical Condition and Psychological Factors |
| Axis II | Personality Disorder, Not Otherwise Specified, with Dependent and Avoidant Characteristics |
| | Borderline Intellectual Functioning by Previous Evaluation |
| Axis III | Fibromyalgia, Osteoarthritis, Bursitis, Hypertension, GERD, Chronic Pain, Hiatal Hernia, Recent Episodes of Colitis |
| Axis IV | Unemployment, Social Problems, Marital Problems |
| Axis V | GAF - 40 to 50 |

19

(Tr. at 682-84.)

On January 29, 2011, Ms. Kelly completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  (Tr. at 687-89.)  She marked that Claimant had a "Good" ability to perform the following work-related mental activities: "Remember locations and work-like procedures; Understand and remember short, simple instructions; Carry out short, simple instructions; Sustain an ordinary routine without special supervision; Ask simple questions or request assistance; Get along with co-workers and peers; Maintain socially appropriate behavior; Adhere to basic standards of neatness and cleanliness; Respond appropriately to changes in the work setting; Be aware of normal hazards and take appropriate precautions."  (Tr. 687-88.)  She marked that Claimant had a "Fair" ability to perform these activities: "Understand and remember detailed instructions; Carry out detailed instructions; Work with or near others without being distracted by them; Make simple work-related decisions; Interact appropriately with the public; Accept instructions and respond appropriately to criticism from supervisors; Travel in unfamiliar places or use public transportation."  Id.  She marked that Claimant had a "Poor" ability to do these work-related mental activities: "Maintain attention and concentration for extended periods; Perform activities within a schedule, maintain regular attendance and be punctual; Complete a normal workday or workweek; Perform at a consistent pace; Set realistic goals or make plans independently of others."  Id. She concluded that Claimant could manage benefits in her own best interest.  (Tr. at 689.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not properly weigh Claimant's credibility regarding her

subjective complaints of pain and other symptoms; (2) the ALJ failed to consider all of the claimant's limitations in the residual functional capacity [RFC]; and (3) the ALJ failed to give adequate weight to the opinions of Dr. John Todd and Sheila Kelly, M.A.  (Pl.'s Br. at 12-19.)

The Commissioner's Response

The Commissioner responds that the ALJ's decision is supported by substantial evidence because (1) the ALJ properly determined Claimant's credibility; (2) The ALJ properly assessed Claimant's RFC; and (3) the ALJ properly evaluated the opinions of Dr. Todd and Ms. Kelly.  (Def.'s Br. at 11-19.)

Analysis

Credibility Determination

Claimant first argues that the ALJ did not properly weigh Claimant's subjective complaints of pain and other symptoms.  (Pl.'s Br. at 12-17.)  Specifically, Claimant asserts:

> The ALJ's credibility determination is not supported by substantial evidence. The ALJ's assessment of the Plaintiff's credibility is erroneous for several reasons.  As a general point, the opinion contains numerous findings indicative of the ALJ's misunderstanding regarding fibromyalgia...The ALJ determined the Plaintiff suffered from several severe impairments, including "osteoarthritis/fibromyalgia."  (Tr. 15.)  In failing to differentiate between these two impairments, the ALJ revealed a limited understanding not only of the nature of the fibromyalgia, but also of its symptoms, diagnostic criteria, and prognoses.  Unfortunately, the ALJ's misunderstandings pervade his credibility determination.
>
> First, [the] ALJ erred in relying heavily on objective testing, especially given the nature of the Plaintiff's impairments.  Plaintiff consistently complained of pain all over her body.  This type of generalized pain is typical of fibromyalgia, as symptoms are generalized, in contrast to localized soft-tissue pain and tenderness.  It is not surprising that the Plaintiff showed no swelling or decreased ranges of motion, as such symptoms are not indicative of fibromyalgia.  It is also not surprising that X-ray results were normal.  Many fibromyalgia patients also have migraine or tension headaches.  Interestingly,

the ALJ relied on normal results of testing conducted pursuant to the Plaintiff's complaints of headaches but failed to mention brain MRI results which revealed small foci indicative of migraine headaches.

Second, the ALJ failed to consider the consistency of the Plaintiff's statements alongside the rest of the relevant evidence of record, ignoring significant portions of the record that bolstered the Plaintiff's credibility. The ALJ opined that the Plaintiff had no problems with medications and her complaints were maintained conservatively with primarily medication; however, the record actually reveals that the Plaintiff has experienced difficulty with many medications.   While the ALJ pointed to a record indicating Lyrica had helped, he did not mention that the Plaintiff eventually reported having to stop Lyrica due to headaches.  The ALJ pointed to the Plaintiff's initial report that Zoloft was helpful; however, though he acknowledged her request to switch anti-depressants, he failed to mention her subsequent report that she had tried Zoloft, but it had made her feel worse.   He did not acknowledge that, after switching from Zoloft to Wellbutrin, the Plaintiff reported Wellbutrin was not helpful and was referred for psychiatric treatment.  While the ALJ acknowledged that per Dr. Braun's recommendation, the Plaintiff tried Cymbalta, he failed to mention the Plaintiff's subsequent reports that it made her nauseous. The ALJ mentioned that Buspar had helped the Plaintiff, but did not mention that the Plaintiff complained of dizziness with it; thus, she was advised to take it before bed instead.   Contrary to the ALJ's findings, the evidence of record reveals that the claimant tried several different medications but failed with many of them.

Third, the ALJ failed to assess the Plaintiff's statements in light of the longitudinal record...A review of the longitudinal record indicates that as the Plaintiff's pain increased over time, so did her limitations.  In August 2010, Dr. Triplett noted worsening fibromyalgia, worsening right carpal tunnel syndrome, and not surprisingly, worsening insomnia.   In fact, during consultative examination in September 2009, Dr. Kip Beard observed the Plaintiff's gait to be slow with a limp (a fact also omitted in the ALJ's assessment).  The Plaintiff eventually sought more aggressive treatment for pain at the Center for Pain Relief.  As the plaintiff's pain increased, so did her difficulties with regard to mental impairments.   While the plaintiff first sought medication to help with depression, she was eventually referred for psychiatric treatment.  The Plaintiff's statements to Sheila Kelly during her second evaluation in January 2011 reveal the Plaintiff was no longer keeping up with housework and was eating mainly soup and canned food.  Further, the record also reveals that as her stress increased, so did pain and related symptoms.   For example, the Plaintiff indicated during treatment for headache at CAMC that she had been under increased stress lately.  And though the Plaintiff reported to Dr. Kresa-Reahl in January 2010 that her headaches had improved, she also stated that she had recently been

experiencing more stress. In February 2010, she reported to FamilyCare with headache and increased joint pain. The Plaintiff testified at the hearing that…while medication helped with her headaches, she experienced more intense ones at certain times. She indicated that she had a headache that day.

Finally, the ALJ erred in failing to consider the Plaintiff's statements and the statements of other providers, as is required by the regulations. A thorough review of all the evidence reveals that the Plaintiff's statements were consistent throughout the record. The claimant consistently reported performing the same activities, such as going to church and going to the grocery store once a week with her husband. She consistently reported struggling with hygiene. She reported difficulty dealing with stress, feelings of anger, and frequent crying spells. In fact, she cried during several of her psychiatric evaluations. Dr. Braun noted that she was very negative, and fibromyalgia affected her daily. Ms. Kelly opined that her aches and pains were exacerbated by her anxiety and depression. Ms. Kelly also indicated that her personality pathology combined with depression and anxiety would cause her to experience pain at a more magnified level than actual clinical abnormalities would evidence. Dr. Braun's and Ms. Kelly's statements are extremely illustrative characterizations of the Plaintiff and offer additional insight into her struggle with pain, depression, anxiety, and insomnia. Additionally, they are consistent with the nature of fibromyalgia. This evidence, ignored by the ALJ, supports the Plaintiff's credibility.

(Pl.'s Br. at 14-16.)

The Commissioner responds that Claimant failed to meet her burden of proving that her impairments prevented her from performing the jobs identified by the vocational expert (Tr. 13-27) and substantial evidence supports the ALJ's decision that she could perform a range of unskilled, light work (Tr. 26). (Def.'s Br. at 11-12.) Specifically regarding Claimant's credibility, the Commissioner asserts:

More than a mere scintilla of evidence supports the ALJ's finding that Plaintiff's complaints about her pain and mental symptoms were not fully credible. The ALJ followed the controlling regulations in finding that Plaintiff's description of her limitations was not fully credible…

As the ALJ explained, the medical evidence undermines the alleged severity of Plaintiff's symptoms (Tr. 20-25)…Plaintiff alleged having disabling pain over her entire body, including back pain, hip pain, and headaches (Tr. 218). Despite her pain, Plaintiff's physical examinations revealed that she had full

strength and full range of motion in all extremities (Tr. 476-79, 481, 483-84, 622, 674-75).  When she went to visit a neurologist regarding her occasional headaches, the neurologist reported that her headaches were under control (Tr. 481, 483).

From a mental standpoint, Plaintiff's treatment was brief and conservative (i.e., two visits to a family physician during which Wellbutrin was prescribed and deemed effective, and three months of treatment at Process Strategies, during which Drs. Braun and Todd noted that she made good progress) (Tr. 407, 468-69, 487-88, 495-97, 634).   Her treatment was limited to medication, and she never received any in-patient mental health care.  In short, the mental health records do not suggest an individual with debilitating symptoms...

Plaintiff's conservative treatment also undermines her allegations of debilitating pain and mental impairments (Tr. 22-25)...

Plaintiff claims to have experienced sleep problems, but she never consulted a sleep specialist or sought treatment specifically for her sleeping difficulties.  Rather, she merely mentioned a worsening sleep pattern to her rheumatologist, who prescribed Ambien (Tr. 476, 478).   Although she experienced headaches that resulted in emergency room visits in 2009 and 2010, both headaches resolved after she received treatment (Tr. 481, 483).  Her medical visits to her family practitioner were often to treat minor or easily-controlled matters, such as esophageal dilation (Tr. 471) or high blood pressure (which improved with medication) (Tr. 651).  Her claims of body aches and pains, particularly in her back, hips, knees, were belied by benign objective findings: an MRI showing only mild cervical spondylosis (Tr. 678); x-ray evidence reflecting Plaintiff's knees were normal (Tr. 358, 422); and examination findings showing full strength (i.e. 5/5) and full range of motion in all extremities (Tr. 372, 476-79, 481, 483-84, 622, 674-75).  Moreover, Plaintiff did not seek more aggressive treatment for her alleged pain: she did not use a TENS unit and only briefly sought relief at a pain clinic (Tr. 690-705).

Similarly, Plaintiff was conservatively treated for her mental impairments.  She sought treatment for only a three month period in 2010, and not once during any of these visits did Drs. Braun or Todd suggest that Plaintiff had disabling symptoms.  To the contrary, they both assigned GAF scores of 60, reflecting borderline mild symptoms (Tr. 487-88).   During the course of Plaintiff's limited treatment, Plaintiff was treated only with medication (Tr. 469, 481, 490).  But for most of the period she claims she was disabled, she was taking no mental health medication at all (Tr. 469, 490).   The conservative treatment of both Plaintiff's physical and mental impairments undermines her claim that her impairments were disabling...

Plaintiff's activities of daily living are also inconsistent with the level of functioning expected of an individual experiencing debilitating symptomatology... Plaintiff was the care-giver of her six-month old nephew and was given custody of the boy (Tr. 44-45).  She enjoyed watching television, reading and talking with her daughter by phone multiple times per day (Tr. 50, 250, 408).  She performed housework, including cleaning dishes and preparing lunch and dinner (Tr. 250).  Plaintiff drove, socialized with friends, shopped for groceries, and attended weekly church services (Tr. 40, 50-51, 254, 405).  Plaintiff would frequently attempt to assist both her mother and sister with their personal problems (Tr. 407).  Plaintiff's daily activities, therefore, suggest she was more functionally capable than she alleged...

The ALJ followed the controlling regulations in finding Plaintiff's complaints not fully credible in light of the medical evidence, medical opinions, conservative treatment, and daily activities.  Moreover, the ALJ accounted for Plaintiff's complaints by limiting her only to a range of light work involving limited mental demands.

(Def.'s Br. at 13-16.)

In a foot note, the Commissioner stated: "One of the Plaintiff's claims - that the ALJ failed to assess the longitudinal record - is inapt and will not be addressed further (Pl.'s Br. at 16-17).  Indeed, the ALJ issued an extremely thorough fifteen page opinion, addressing all of the relevant records over Plaintiff's short (i.e. 22 months) longitudinal treatment period (Tr. 335-705)."  (Def.'s Br. at 13.)

In a reply brief, Claimant argues:

The ALJ...relying only on objective findings, included no discussion as to why he did not believe the Plaintiff's statements regarding her symptoms...medical findings and observations demonstrate that the Plaintiff consistently was found to have pain upon palpitation of most, if not all, of the tender points associated with fibromyalgia...

This characterization significantly understates Plaintiff's treatment for difficulty sleeping.  Poor sleep and fatigue are characteristic of fibromyalgia; Plaintiff's treatment with a specialist – a rheumatologist - to address these symptoms is reasonable and can hardly be considered conservative...Defendant also references normal diagnostic tests...this treatment was hardly conservative...X-rays...MRI...CT...myocardial stress testing...EKG; and tilt testing in an effort to obtain relief.  In addition, the

Plaintiff underwent several injections...Defendant also references Plaintiff's "limited" mental health treatment (Def's Br. at 15), but at no point references the Plaintiff's indication to Ms. Kelly that she had to drop out of treatment due to inability to afford the insurance deductible. (Tr. 681)...

A review of the record reveals that the Plaintiff's activities of daily living were much more limited. While she indicated in September 2009 that she did the housework for the most part, she also stated that her husband helped and she had difficulty finishing projects. She also stated that she rarely goes outside. The Plaintiff reported in January 2011 that she wasn't keeping up with the housework, stayed in her pajamas several days of the week, and only left her house once a week to go to the grocery store with her husband. (Tr. 683.)

(Pl.'s Reply Br. at 1-3.)

The ALJ made very extensive findings in his 15-page decision regarding Claimant's credibility:

The claimant testified she has a ninth grade education. She indicated she experiences pain due to osteoarthritis. The claimant noted she has pain in the hips and legs. She testified she can only walk about one block. The claimant indicated she has fibromyalgia and has pain in every part of her body. She noted she is depressed and anxious. The claimant testified she went to Process Strategies for mental health treatment for about one year. She indicated she sometimes does laundry and her husbands helps her a lot. The claimant noted she goes to Sunday School and to see her mother once a week. She testified she became disabled in June of 2008 when she stopped taking care of her mother. The claimant indicated she has neck pain and recently received injections. She noted she takes her husband to work and then lies down for two hours.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The objective findings do not support the severity of the claimant's rather extreme allegations and reveal she is not fully credible. A report of history and physical by Leah M. Triplett, D.O., at Mountain State Medicine and Rheumatology, PLLC dated January 7, 2009, reveals the claimant presented for evaluation of joint pain and fibromyalgia. The claimant reported she had morning stiffness of one hour. Dr. Triplett noted the claimant was currently

26

taking Darvocet and instructed her to add Lyrica. She indicated the claimant had 18/18 fibromyalgia tenderpoints strongly positive, but was in no acute distress. Dr. Triplett found musculoskeletal examination of the claimant's shoulder, upper arm, elbow, wrist, hand, hip, thigh, knee, lower leg, ankle, and foot revealed no tenderness, swelling, deformities, instability, subluxations, weakness or atrophy. Dr. Triplett noted range of motion in all planes was full and painless. The claimant also had normal gait (Exhibit 7F). In fact, x-ray reports of claimant's knees bilaterally dated March 5, 2009, were normal (Exhibit 11F).

On March 12, 2009, Dr. Triplett noted the claimant underwent injections. However, Dr. Triplett also recommended the claimant increase daily aerobic exercise and continue Lyrica. On May 20, 2009, the claimant reported she had been doing well. In fact, the claimant noted her joint and muscle pain was improved. The claimant indicated Lyrica and the injection helped her pain. She reported her sleep pattern had normalized. The claimant noted her current medications included Darvocet, Lyrica, and Mobic. She denied any symptoms related to her medications (Exhibit 7F).

On November 10, 2009, the claimant was admitted to CAMC with complaint of headache and chest pain. The claimant's cardiac enzymes were negative. In fact, the claimant had an extensive workup with multiple procedures, including lumbar puncture, chest x-ray, CT of the head, echocardiogram, MRI of the brain, MRA of the head, MRV of the brain, and myocardial stress test, all of which were negative for any acute abnormalities. The claimant's headache improved and she was discharged on November 12, 2009 (Exhibit 12F). Additionally, a FamilyCare visit note dated December 2, 2009, reveals the claimant reported her headache had resolved (Exhibit 16F). Furthermore, during evaluation by Kiren Kresa-Reahl, M.D., at Capitol Neurology on January 4, 2010, the claimant reported her headaches had been much better. Dr. Kresa-Reahl indicated the claimant had multiple pain points consistent with fibromyalgia. However, Dr. Kresa-Reahl noted the claimant's motor strength was 5/5 throughout all groups, with normal bulk and tone. She found the claimant's gait was intact to heel, toe, and tandem walk. Dr. Kresa-Reahl indicated she was giving the claimant Fiorinal (Exhibit 18F).

On April 20, 2010, Dr. Triplett noted the claimant presented for evaluation, but had not been seen for a year. Dr. Triplett noted the claimant had 18/18 tenderpoints markedly present. However, on examination Dr. Triplett found the claimant had no tenderness, swelling or deformities and full and painless range of motion of the upper extremities. The claimant also had normal findings of the lower extremities, with the exception of having general tenderness of the hips (Exhibit 17F).

27

An emergency room record from CAMC dated April 29, 2010, reveals the claimant presented with complaint of feeling dizziness and headache...The claimant's EKG, CBC, and Tilt test were essentially unremarkable. A CT report of the head was normal...The claimant was given medication and discharged (Exhibit 22F). In fact, on May 10, 2010, the claimant reported to Dr. Kresa-Reahl that her headaches had been under good control. Dr. Kresa-Reahl opined that the claimant's headaches were under control (Exhibit 18F).

On June 10, 2010, the claimant reported to Dr. Triplett that she could not tolerate Cymbalta or Savella. The claimant denied joint swelling and reported she had been walking a little bit more. Dr. Triplett noted the claimant had tenderpoints markedly present. The claimant indicated most of her pain was in the hands, arms and left hip. However, on examination, Dr. Triplett found the claimant had no tenderness and full range of motion of the upper extremities, including the hands. The claimant did have tenderness of the left hip, but full range of motion. She was given an injection. Dr. Triplett recommended the claimant increase daily aerobic exercise, including water therapy and take Neurontin (Exhibit 24F). Additionally x-ray reports of the claimant's right hand and bilateral knees dated June 10, 2010, were normal with no significant degenerative changes present (Exhibit 27F).

On August 23, 2010, the claimant reported to Dr. Triplett that the injection alleviated her pain for six weeks. The claimant indicated she was doing some walking daily. She complained that Darvocet was not helping her very much. Dr. Triplett discontinued the claimant's Darvocet and instructed her to take Neurontin, Ultram, and Azithromycin. She again recommended the claimant increase daily aerobic exercise (Exhibit 34F). In addition, a FamilyCare visit note dated September 9, 2010, reveals the claimant was seen in follow-up for hypertension and her blood pressure was 118/79. It was noted the claimant was doing well on medication and had no side effects (Exhibit 32F).

Furthermore, during consultative medical examination on September 14, 2010, Kip Beard, M.D., noted the claimant had hypertension, but no evidence of end organ damage. In fact, on examination the claimant's blood pressure was 120/70. The claimant was able to arise from a seat and step up and down from the examination table without difficulty...claimant's range of motion of the knees, ankles, and feet was normal...She had left hip tenderness in the greater trochanter and pain on motion testing with normal motion. However, Dr. Beard noted the claimant had normal motion of the hips and back. Dr. Beard indicated the claimant had negative evaluation for any neurological compromise. Additionally, an x-ray of the claimant's lumbar spine was normal (Exhibit 29F).

On October 26, 2010, the claimant underwent left trochanteric bursa

injection (Exhibit 34F).  Additionally, an x-ray report of the claimant's left knee dated December 15, 2010, was negative (Exhibit 33F).  Dr. Triplett indicated on December 22, 2010, that the claimant had normal range of motion in the upper and lower extremities.  She noted the claimant would take Celebrex and discontinue Azithromycin and Ultram (Exhibit 34F).

An MRI report of the claimant's cervical spine dated January 22, 2011, showed impression of mild cervical spondylosis secondary to chronic changes and no disc herniation or significant spinal stenosis (Exhibit 35F).  A record from The Center for Pain Relief dated February 28, 2011, indicates the claimant was scheduled for injections on March 9, 2011, March 23, 2011, and April 6, 2011 (Exhibit 38F).

The objective findings of record on multiple testing and during examinations indicate the claimant is not as physically limited as alleged.  In fact, the evidence reveals the claimant's complaints are maintained conservatively with primarily medication.  Additionally, the claimant consistently reported she experienced no side effects of medication.

Regarding mental health, Leah M. Triplett, D.O., at Mountain State Medicine and Rheumatology, PLLC indicated on January 7, 2009, the claimant denied having any anxiety or depression.  On March 12, 2009, the claimant denied anxiety, but admitted having some depression (Exhibit 7F).  However, a FamilyCare Visit Note dated August 11, 2009, indicates the claimant was taking Zoloft and reported it was helpful (Exhibit 16F).

The claimant's representative referred the claimant to Sheila E. Kelly, M.A., for psychological evaluation on September 19, 2009.  Ms. Kelly noted the claimant had no history of psychiatric treatment prior to Zoloft that was prescribed a few months ago.  The claimant reported she believed her Zoloft was somewhat helpful.  On WAIS-III testing the claimant obtained a...full scale IQ of 74...Ms. Kelly noted the claimant had sufficient academic ability to function from one day to the next, but overall would struggle with complex written or oral instructions (Exhibit 10F).  Although there is no other evidence of borderline intellectual functioning in the record, the claimant is given benefit of doubt found to be restricted from performing complex or detailed instructions in her residual functional capacity.

A FamilyCare Visit Note dated December 2, 2009, indicates the claimant requested a different anti-depressant and was prescribed Wellbutrin.  On February 18, 2010, it was noted the claimant would be referred for psychiatric treatment (Exhibit 16F).  On March 15, 2010, the claimant underwent comprehensive psychiatric evaluation by Nohl Braun, M.D., at Process Strategies.  Dr. Braun noted the claimant was alert and oriented.  He indicated the claimant's judgment and insight were intact.  Dr. Braun opined

the claimant had average/above average intelligence based on her history and mental status examination. He indicated the claimant had symptoms of major depression and was agreeable to treatment with Cymbalta. Additionally, an initial evaluation by John Todd, Ph.D., at Process Strategies dated March 26, 2010, reveals the claimant had a depressed mood, but was well groomed and cooperative. Dr. Todd noted the claimant had been prescribed Cymbalta by Dr. Braun. A report of Med Check dated April 13, 2010, reveals the claimant reported she was unable to fill her prescription due to insurance. However, Dr. Braun noted the claimant's insurance would be contacted and she was in agreement to restart trial of Cymbalta (Exhibit 19F). On June 1, 2010, Dr. Braun noted the claimant reported good progress. The claimant indicated her mood had been good and her anxiety was under control. She noted she had no acute reactions or side effects to medication. Dr. Braun indicated the claimant was taking Buspar and had good progress on medication (Exhibit 30F). However, on August 23, 2010, Dr. Triplett noted the claimant reported she was no longer seeing Dr. Braun (Exhibit 34F).

On January 29, 2011, the claimant's representative referred the claimant to Ms. Kelly for an update of a previous evaluation performed on September 19, 2009. The claimant reported she was not taking anti-depressants for four to five months prior to a prescription of Pristiq a couple of weeks ago. She indicated she dropped out of treatment at Process Strategies because she was unable to afford the deductible on her insurance. Ms. Kelly noted the claimant claimed to sleep poorly, but she suspected she dozed off and on during the day. She indicated the claimant obtained a score of 31 on the Beck Depression Inventory -II, which reflected moderate to severe levels of depression. Ms. Kelly found the claimant's cognitive functioning was within normal limit (Exhibit 37F). Furthermore, although the claimant reported she quit treatment with Dr. Braun, his treatment notes her mental health conditions were under good control with medication. The claimant submitted a medications list on which she indicated Dr. Triplett is now prescribing her Prozac and Elavil (Exhibit 20E).

The claimant testified as to having minimal activities of daily living. However, information in the record is contradictory to the severe limitations alleged and reveals the claimant functions at higher level physically, psychologically, and intellectually. The claimant reported to Ms. Kelly that for the most part, she did the housework and cooking. She indicated she attended Sunday School once a week. The claimant noted she talked to her daughter several times a day. She reported she went to the grocery store with her husband on weekends. The claimant indicated she read the Bible and fed her cats (Exhibit 10F). She noted on a questionnaire she had no problems getting along with family, friends, neighbors, or others. The claimant indicated she did "okay" at following written and spoken instructions (Exhibit

30

11E).

The evidence reveals the claimant's conditions are maintained conservatively and effectively with primarily medication. Additionally, there is no evidence the claimant experiences side effects of medication that would interfere with her ability to perform work activity.

As for the opinion evidence, the claimant's representative referred the claimant to Sheila E. Kelly, M.A., for psychological evaluation on September 19, 2009. Ms. Kelly completed a mental assessment...Ms. Kelly found the claimant had GAF of 40 to 50. Ms. Kelly completed a second mental assessment form on which she indicated the claimant had poor ability to function in five areas. The claimant had fair ability to function in seven categories (Exhibit 37F). The undersigned gives little weight to the opinions of Ms. Kelly, as they are too extreme. The claimant was referred to Ms. Kelly twice by her representative and the opinions are based on self-reports, which are not fully credible. The opinions of Ms. Kelly are not supported by treatment records, which reveal the claimant is not as psychologically limited as alleged.

On March 15, 2010, the claimant underwent comprehensive psychiatric evaluation by Nohl Braun, M.D., at Process Strategies, and was found to have global assessment functioning (GAF) level of 60. Additionally, a progress note by John Todd, Ph.D., dated May 11, 2010, indicates the claimant's GAF was 60 (Exhibit 19F). The undersigned gives great weight to these GAF opinions, as they are consistent with information in the treatment records and the claimant's essentially normal activities.

John Todd, Ph.D., at Process Strategies, completed a mental assessment on June 16, 2010, on which he indicated the claimant had poor ability to function in two areas. The claimant had fair ability to function in nine categories, and no social limitations (Exhibit 25F). The undersigned gives weight to these opinions to the extent that the record supports concluding the claimant had poor ability to understand, remember, and carry out detailed instructions, which was determined by Dr. Todd. However, the definition of fair is identified on this assessment as unable to perform satisfactorily up to 1/4 of the workday and the evidence does not support finding the claimant had such limited ability to function in nine areas as indicated by Dr. Todd. In fact, as noted above on May 11, 2010, Dr. Todd had opined the claimant had a GAF of 60.

During consultative medical examination on September 14, 2010, Kip Beard, M.D., completed a physical assessment form... (Exhibit 29F). The undersigned gives significant weight to the opinions of Dr. Beard to the extent that the evidence supports concluding the claimant can perform the

31

lifting and carrying demands of light work, but requires a sit/stand option.

A. Rafael Gomez, M.D., a State agency medical consultant, reviewed the record on March 5, 2009, and completed a physical assessment form on which he indicated the claimant could perform light exertion...(Exhibit 3F). Additionally, Uma Reddy, M.D., a State agency medical consultant, reviewed the record on June 11, 2009, and completed a physical assessment from on which she found the claimant could perform light exertion...(Exhibit 8F). The undersigned gives the State agency opinions weight to the extent that they are consistent with finding the claimant can perform work activity. However, the claimant is given the benefit of doubt and found to have the limitations as identified in the residual functional capacity. Although, the evidence also supports concluding the claimant is not as limited as alleged.

(Tr. at 19-25.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and

32

how the symptoms affect the individual's ability to work.

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court finds that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause her alleged symptoms. (Tr. at 20.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 20-24.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. (Tr. at 20-25.)

Contrary to Claimant's assertions, the ALJ did not display a fundamental misunderstanding of fibromyalgia. (Pl.'s Br. at 15.) The ALJ fully considered and discussed Dr. Triplett's diagnosis of fibromyalgia and that she indicated Claimant had "18/18 fibromyalgia tenderpoints." (Tr. at 20.)   As explained by the Fourth Circuit in Stup v. UNUM Life Ins. Co., 390 F.3d 301 (4th Cir. 2004),

> [f]ibromyalgia is a rheumatic disease with . . . symptoms including "significant pain and fatigue," tenderness, stiffness of joints, and disturbed sleep. Nat'l Institutes of Health, *Questions & Answers About Fibromyalgia*

1 (rev. June 2004), http://www.niams.nih.gov/hi/topics/fibromyalgia/ Fibromylagia.pdf. *See also Ellis v. Metro Life Ins. Co.*, 126 F.3d 228, 231 n.1 (4th Cir. 1997) (quoting Taber's Cyclopedic Medical Dictionary (16th ed. 1989)); *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996). Doctors diagnose fibromyalgia based on tenderness of at least eleven of eighteen standard trigger points on the body. *Sarchet*, 78 F.3d at 306. "People with rheumatoid arthritis and other autoimmune diseases, such as lupus, are particularly likely to develop fibromyalgia." Nat'l Institutes of Health, *supra*, at 4. Fibromyalgia "can interfere with a person's ability to carry on daily activities." *Id.* at 1. "Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not." *Sarchet*, 78 F.3d at 307 (citations omitted).

Stup, 390 F.3d at 303.

Although the ALJ's Decision, April 4, 2011, predates the effective date of Social Security Ruling 12-2p, July 25, 2012, the undersigned has considered the ruling which provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia and how we evaluate fibromyalgia in disability claims and continuing disability reviews.    In the subject claim, the ALJ made a determination that Claimant's fibromyalgia was a severe impairment.  (Tr. at 15.)  The ALJ acknowledged that Leah M. Triplett, D.O., Mountain State Medicine and Rheumatology was treating Claimant for both fibromyalgia and osteoarthritis.    (Tr. at 15, 20-22.)  The ALJ considered Claimant's fibromyalgia under Section 14.09 of the listings and determined: "[T]here is no evidence of a history of joint pain, swelling, tenderness resulting in an inability to ambulate effectively or perform fine and gross movements effectively as required by the Listing."  (Tr. at 17.)  The ALJ provided the same analysis for Claimant's osteoarthritis which is evaluated under Section 1.02 of the Listing of Impairments.  Id. Regarding Claimant's headaches, which Claimant asserts are related to her fibromyalgia, the ALJ evaluated them under multiple listings of Section 11.00 for Neurological

Impairments and concluded:  "[T]here is no evidence the claimant's headaches meet or equal the criteria of a listing."  Id.

Under SSR 12-2p, the ALJ is then required to follow the two-step process set forth in SSR 96-7p, which as previously discussed, the ALJ performed and fully explained his reasons for finding Claimant not entirely credible.  The ALJ then continued his analysis using the 5-step sequential evaluation process to determine whether Claimant, with an acknowledged severe fibromyalgia impairment, was disabled.

Also, contrary to Claimant's assertions, the ALJ extensively considered Claimant's various medications, her frequent changes of medications, and the various doctors' accommodations to Claimant's requests for medication changes.  (Tr. at 20-24.)

Regarding Claimant's assertions that the ALJ failed to "assess Plaintiff's statements in light of the longitudinal record" and "consider...the statements of other providers", the undersigned finds that the ALJ made extensive findings, fully considering Claimant's statements and provider statements, that more than adequately assessed Claimant's entire treatment period of approximately two years.  (Pl.'s Br. at 16-17.)  Additionally, the record clearly is in alignment with the ALJ's statements that Claimant's treatment has been "conservative" which generally translates to "non-surgical" and with the expectation that either natural healing will occur or progress of the condition will be so slow that drastic treatment would not be justified.

Residual Functional Capacity

Claimant next argues that the ALJ "failed to consider all of the claimant's limitations in the RFC."  (Pl.'s Br. at 17.) Specifically, Claimant asserts:

An individual must be able to perform work on a continued basis, 8 hours a day and 5 days a week. The ALJ completely failed to address the Plaintiff's ability to do so, as he completely ignored the Plaintiff's well-documented complaints of difficulty sleeping and fatigue. Records clearly indicate the Plaintiff's consistent reports of fragmented sleep and associated fatigue and pain. She reported difficulty sleeping due to pain in reports submitted to SSA. She sought medication to help her sleep as well as treatment to decrease her pain (and thus sleep better). She reported on multiple occasions to multiple providers that she experienced fragmented sleep due to pain. Similarly, the Plaintiff consistently reported that she had difficulty functioning during the day, as her lack of sleep affected her cognitive abilities. She struggled with depression and anxiety and she consistently reported difficulty handling stress. The record is replete with evidence documenting these additional limitations; however, the ALJ failed to consider them in the RFC.

(Pl.'s Br. at 18.)

The Commissioner responds that substantial evidence supports the ALJ's RFC assessment. (Def.'s Br. at 16.) More specifically, the Commissioner asserts:

Plaintiff's lone challenge to the physical aspect of the ALJ's RFC assessment is that the ALJ did not consider Plaintiff's alleged sleeping difficulties in formulating the RFC (Pl.'s Br. at 18). However, in compliance with the regulations, the ALJ formulated an RFC after considering all of the relevant evidence, including Plaintiff's own subjective allegations. Regarding Plaintiff's alleged sleeping problems, the record is devoid of any evidence that Plaintiff's alleged sleep troubles were significant (Tr. 53, 404), which undermines Plaintiff's claim that her sleep issues were debilitating in nature. When asked about her sleeping problem at the hearing, Plaintiff did not claim that she did not sleep at night, but that she finds the lounge chair or couch more comfortable than her bed (Tr. 48). Significantly, there is no medical evidence which describes the extent of her sleeping problems, let alone describes the effects that such problems had on her ability to function in the workplace. Rather, Plaintiff reported some sleeping difficulty to Dr. Triplett, who prescribed Ambien (Tr. 476, 478). It was, therefore, reasonable for the ALJ to find that the impairment did not cause any significant limitations to account for in the RFC. Even if - as Plaintiff points out in her brief (Pl.'s Br. at 18), Plaintiff's impairment resulted in a decline in her cognitive functioning, the ALJ more than accounted for this limitation by limiting Plaintiff to unskilled work in which Plaintiff would not be asked to follow complex or detailed instructions (Tr. 19). Thus, the ALJ generously accounted for the effects of all of Plaintiff's credible established limitations in formulating her restrictive functional capacity assessment.

(Def.'s Br. at 17-18.)

In the Reply brief, Claimant asserts:

[T]he record clearly demonstrates the interrelationship of the Plaintiff's lack of sleep and pain. Dr. Triplett treated Plaintiff's lack of sleep as well as pain. Both Dr. Todd and Ms. Kelly recognized the relationship of the Plaintiff's pain to her fatigue, noting the effect of her pain and fatigue on her activities of daily living (Tr. 490), as well as on her levels of stress and ability to sleep.

(Pl.'s Br. at 3-4.)

The ALJ made these findings regarding Claimant's severe impairments and her RFC:

The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, cervical spine facet joint disease, hypertension, osteoarthritis/fibromyalgia, headaches, depression, anxiety, and low intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

(Tr. at 15.)

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can only stand or walk for a total of four hours during an eight-hour workday. The claimant can sit a total of four hours during an eight-hour workday. She requires a sit/stand option every 30 minutes, but without abandonment of task or leaving the workstation. The claimant is limited to occasional pushing and pulling. She cannot perform foot control operations or climb ladders, ropes and scaffolds. The claimant must avoid all exposure to hazards and is unable to drive. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant can occasionally reach, including overhead. She can frequently, but not constantly, handle, finger, and feel with right extremity. The claimant must avoid concentrated exposure to extremes of heat and cold, wetness and humidity, excessive noise, excessive vibration, and pulmonary irritants. She cannot perform complex or detailed instructions.

(Tr. at 19.)

The vocational expert testified the claimant's past relevant work as a deli worker was light exertion with SVP of 3 and sometimes performed at a medium exertion level. She indicated the claimant's past relevant work as a daycare worker was light exertion with SVP of 4...

Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform...

The vocational expert testified the Dictionary of Occupational Titles does not address the limitation of a sit/stand option. However, the vocational expert noted her testimony was based on knowledge and vocational experience. Therefore, although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational titles, there is a reasonable explanation for the discrepancy and it is accepted by the undersigned.

The claimant's representative asked the vocational expert if an individual could perform work activity if she had severe pain all the time that was distracting. The vocational expert testified there would be no jobs for such an individual. However, the evidence does not support such a limitation.

The claimant's representative asked the vocational expert if there would be jobs an individual could perform if she had the limitations included in Exhibits 10F and 37F. The vocational expert testified there would be no jobs for such an individual. However, as discussed above, the evidence does not support such extreme limitations.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. at 25-26.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2011). "This assessment of your remaining capacity for work is not a decision on whether you are

disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The undersigned finds that the medical evidence of record does not show that Claimant had extensive sleeping problems; rather it shows she reported that her "sleep pattern has worsened" to Dr. Triplett, who prescribed Ambien. (Tr. 476, 478.)   It was reasonable for the ALJ to find that the disturbed "sleep pattern" was not a significant limitation to account for in the RFC.  However, even if this "impairment" - i.e. lack of sleep and resulting fatigue - resulted in a decline in Claimant's cognitive functioning, as suggested by Claimant, the ALJ adequately accounted for this limitation by limiting Claimant to unskilled work in which Claimant would not be asked to follow complex or detailed instructions.  (Tr. 19.)

<u>Weighing Medical Opinions</u>

Claimant next argues that the ALJ failed to give adequate weight to the opinions of

Dr. John Todd and Sheila Kelly, M.A.   More specifically, Claimant asserts:

> The ALJ's assessments of the opinions of Dr. John Todd and Sheila Kelly,
> M.A. are inadequate and a review of the record shows they are consistent with
> the evidence of record.  The ALJ afforded great weight to Dr. Todd's findings
> regarding the Plaintiff's GAF score, which Dr. Todd found to be 55-60 on
> several occasions.  As discussed above, these scores indicated moderate
> symptoms or moderate difficulty in social, occupational or school
> functioning.  The ALJ, turning to Dr. Todd's mental assessment found that
> the evidence did not support Dr. Todd's finding that the claimant had fair
> ability to function in the nine areas indicated by him.  However, the
> assessment indicated fair functioning was moderate functioning, wherein an
> individual was unable to function satisfactorily up to 1/4 of the day.
> Additionally, records from Process Strategies indicate that the Plaintiff was
> consistently depressed and negative.  Dr. Todd's opinions are consistent with
> his treatment records, including his GAF scores.
>
> With regard to Ms. Kelly's assessments, the ALJ failed to indicate that Ms.
> Kelly not only considered the Plaintiff's subjective complaints, but also
> conducted a review of the medical records, 2 clinical interviews, and 2 mental
> status examinations, in addition to the Beck Inventory acknowledged by the
> ALJ.  Ms. Kelly observed at both evaluations that the Plaintiff was tearful.
> Her mood was depressed and anxious.  She had difficulty on MSE.  Further,
> Ms. Kelly determined that the Plaintiff's personality pathology, in
> combination with her depression and anxiety, caused her to experience pain
> at a more magnified level.  The opinions of Dr. Todd and Ms. Kelly are not
> only supported by their findings, but also, by the evidence of record as set
> forth in the preceding arguments.

 (Pl.'s Br. at 18-19.)

The Commissioner responds that the ALJ afforded proper weight to the

opinions of Dr. Todd and Ms. Kelly.  More specifically, the Commissioner asserts:

> Here, the ALJ appropriately found that the functional assessments of Ms.
> Kelly and Dr. Todd were entitled to little weight for several reasons.
>
> First, the ultimate issue of whether a claimant is disabled is a legal
> determination that is reserved to the Commissioner, and opinions of a
> medical source that a claimant is disabled or cannot work are not entitled to

any special significance. 20 C.F.R. § § 404.1527(e)(I), 416.927(e)(I); SSR 96-5p, 1996 WL 374183 (1996).

Second, both Ms. Kelly and Dr. Todd's functional assessments were entitled to only minimal weight due to the limited frequency and short duration of their relationship with Plaintiff.    20 C.F.R. § § 404.1527(d)(2)(I), 416.927(d)(2)(I).  Plaintiff's disability attorney referred her to Ms. Kelly for a consultation.  After only one consultation, Ms. Kelly opined that Plaintiff had a "poor" ability to perform work-related activities in three areas and only "fair" in three other areas (Tr. 411-12).  [Footnote 7: The forms Ms. Kelly (Tr. 411-12, 687-89) and Dr. Todd (Tr. 595-97) completed are not the Mental RFC forms the Commissioner utilizes.  Rather, they appear to have been created by Plaintiff's attorney.]  As the ALJ noted, this opinion was based in large part on Plaintiff's subjective complaints, which were not fully credible (Tr. 24).  Ms Kelly met with Plaintiff on only one other occasion (Tr. 680-89).  Based on this limited relationship, the lack of accompanying treatment records, and Ms. Kelly's reliance of Plaintiff's own self-assessment, the ALJ properly declined to consider Ms. Kelly's assessment as an opinion from a treating source (Tr. 24).    20 C.F.R. § § 404.1527(d)(2), 416.927(d)(2). Additionally, although the ALJ considered Dr. Todd a treating source, his relationship with Plaintiff was brief, consisting of a mere two visits in April and May 2010 (Tr. 487-88, 634).

Third, the limitations indicated on Dr. Todd's forms are inconsistent with his own treatment notes.  For example, Dr. Todd contends that Plaintiff had either only "poor" or "fair" ability in nine areas of work-related functioning, without providing any factual basis for this conclusion (Tr. 595-97).  In contrast to the restrictions in his assessment, Dr. Todd assessed Plaintiff with a GAF score of 55 to 60 (Tr. 487-88), which indicates only moderate (bordering on mild) symptoms.  DSM-IV at 32.

Fourth, and described in detail above, the functional capacity assessment of Dr. Todd and Ms. Kelly are also inconsistent with the record as a whole (Tr. 24).    20 C.F.R. § § 404.1527(d)(4), 416.927(d)(4).

(Def.'s Br. at 18-19.)

In a Reply Brief, Claimant argues:

Defendant points out that Ms. Kelly examined Plaintiff twice at the request of Plaintiff's counsel.  (Def's Br. at 18).  However, Ms. Kelly not only administered psychological testing, including mental status examinations and Beck Depression Inventory testing, but also reviewed the Plaintiff's medical records.  (Tr. 402, 680.)  Defendant asserts that the restrictions in Dr. Todd's assessment are not consistent with the GAF score of 55-60 which he assigned

> Plaintiff. (Def's Br. at 19.) However, Dr. Todd's opinion that the Plaintiff
> would [be] able to perform fairly (defined as moderate limitation in function)
> in several areas is consistent with the GAF scores he assessed, which also
> indicated moderate impairment. As discussed above, both Ms. Kelly and Dr.
> Todd noted the relationship between the Plaintiff's pain, fatigue, and
> psychological stress and their effects on the Plaintiff's daily activities. Both
> opined that the Plaintiff would be limited in her abilities to perform tasks
> such as performing at a consistent pace, maintaining concentration for
> extended periods, completing a normal workday or workweek, and
> maintaining regular attendance and being punctual. (Tr. 411, 595, 687.)

(Pl.'s Reply Br. at 4.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory

findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The undersigned finds that the ALJ properly considered the opinion evidence of Ms. Kelly and Dr. Todd and gave "good reasons" for the weight he gave the opinions. As shown on pages 26-32 of this opinion, the ALJ fully addressed the reports of Ms. Kelly and Dr. Todd.   (Tr. at 22-24.)   It is further noted that Claimant did not have a treatment relationship with Ms. Kelly and had a limited treatment relationship with Dr. Todd, i.e. three office visits in March, April, and May 2010 with completely illegible notes, before issuing a mental assessment in June 2010. (Tr. 487-93, 595-97.) The ALJ explained the weight he gave to their opinions:

> Ms. Kelly completed a second mental assessment form on which she indicated the claimant had poor ability to function in five areas. The claimant had fair ability to function in seven categories (Exhibit 37F).   The undersigned gives little weight to the opinions of Ms. Kelly, as they are too extreme. The claimant was referred to Ms. Kelly twice by her representative and the opinions are based on self-reports, which are not fully credible. The opinions of Ms. Kelly are not supported by treatment records, which reveal the claimant is not as psychologically limited as alleged.
>
> On March 15, 2010, the claimant underwent comprehensive psychiatric evaluation by Nohl Braun, M.D., at Process Strategies, and was found to have global assessment functioning (GAF) level of 60.   Additionally, a progress note by John Todd, Ph.D., dated May 11, 2011, indicates the claimant's GAF was 60 (Exhibit 19F).   The undersigned gives great weight to these GAF opinions, as they are consistent with information in the treatment records and the claimant's essentially normal activities.
>
> John Todd, Ph.D., at Process Strategies, completed a mental assessment on June 16, 2010, on which he indicated the claimant had poor ability to function in two areas.   The claimant had fair ability to function in nine categories, and no social limitations (Exhibit 25F).   The undersigned gives

weight to these opinions to the extent that the record supports concluding the claimant had poor ability to understand, remember, and carry out detailed instructions, which was determined by Dr. Todd.  However, the definition of fair is identified on this assessment as unable to perform satisfactorily up to 1/4 of the workday and the evidence does not support finding the claimant had such limited ability to function in nine areas as indicated by Dr. Todd. In fact, as noted above on May 11, 2010, Dr. Todd had opined the claimant had a GAF of 60.

(Tr. at 24.)

It is further noted that Dr. Todd marked that Claimant's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were not affected by her impairment.  (Tr. 596.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Memorandum Opinion to all counsel of record.

ENTER:
March 21, 2013

Mary E. Stanley
United States Magistrate Judge